Good morning, ladies and gentlemen. Our first case for argument, Tate v. Glatt. Mr. Salili. Good morning. May it please the Court. My name is Tom Salili and I represent Glatt Air Techniques. There are a number of points that have been raised in our brief that we submitted. I think they're all warranted consideration by the Court, but I'm going to— All nine or ten or eleven reversible errors you think were committed? Yes, Your Honor. However, though, for purposes of today, I'm going to just discuss three of those that I believe cut to the heart of the case. These are the first three arguments— How big is Glatt? Excuse me, Your Honor? How big is Glatt? I don't know the exact number of employees, Judge. I don't care about the exact number. Approximately how big? It's an engineering branch in New Jersey that does the sales arm. They also do some pharmaceuticals. So what's its annual revenue? I'm not exactly sure, Your Honor. I don't know the answer to that question. I'm curious about all this litigation over $850,000. Well, Your Honor, there was much more damages that were claimed in the case. There were about $8 million in consequential damages. That's right, but it's down to $850,000. That's correct, Your Honor. Why do you litigate over that part? Because we believe that— A trivial amount. I assume Glatt is a large company. $850,000 seems small for an elaborate litigation like this. It's $850,000 plus the contractual attorney's fees that were awarded. So all said and done, it's about a $2 million case. So it is a significant amount of money. And we believe that the district court— The attorney's fees, your attorney's fees? No, there was an award that was entered by the district court for attorney's fees. For Tate's, you mean? For Tate's attorney's fees and professional fees as well, too. That came up to about $1.5 million. So what are your top three? The first is that they all deal with the expert's opinion relative to the fact that there was spark energy that created the fire, was the cause of the fire, and the other deals with the suppression system. The first thing that I'd like the court to take note of is that in order for the plaintiff, the appellee's expert's opinion to stand, he needs to show that there was a crack in one of these filters. In addition to that, not only was there a crack, but that the crack came into connection with all three corners of it. And if he can't establish that, then he can't establish his causation theory that the spark energy created the necessary energy to start the fire. Now, what happened here is we have—the first point is the fact that we had served some Rule 36 admissions in the case and that those had been answered and the plaintiffs had indicated that there had been no evidence, no observations, and no information that there were crack filters in the granulator at the time of the fire itself. And what happened at trial is that they then tried to back away from those requests for admissions without making any type of a motion for leave or withdrawal of that. They tried to admit contradictory evidence of that, and the district court allowed them to do that. And when we asked the district court to enforce the admission and make the admission stand because that issue had been resolved— now, this is an admission that had been made some two years before the trial. And under Rule 36, in order for you to withdraw the admission, you need to make a motion to amend or withdraw. That was never done, so we asked that they stand on that. If, in fact, that admission stood, that would, in essence, be fatal to their case because there would be no evidence that the first way that there would be a crack in the filter. And absent a crack in the filter, the expert couldn't sustain his causation theory. Mr. Solili, have I got this right, that there's—the plaintiff, in essence, was pursuing two defect theories? Correct. And this goes to one of them, right? Yes, Judge. Okay, so there's the separate fire suppression system theory, and I know you've got some challenges to that. Yes. But the Rule 36 issue goes to the— Correct. And just so the court understands, in order for the expert to get his theory to work, he not only needs to show that there is a crack, but he needs to show that all three pieces of metal within the filter element itself came into contact at the same time. Do we have any drawings somewhere in this? I can show you this right here, Your Honor. This may help out a little bit. It's my crude drawing. I'm not an artist, I will admit. But the way the filter anatomy is is there's a metal mesh on the top of the filter, and then there's some metal on the sides of the filter itself. All of this metal is encased within thick plastic. And the way the filter is designed, the metal doesn't connect at all, okay? So there's no disagreement that this, as designed, can't create the necessary energy to create a spark sufficient to ignite the powder. So what this expert has done is he's kind of tried to create the gotcha moment where he said, well, what do we need to do in order to get this spark energy to occur? We can rip off the plastic on the sides, but even then we still don't get the connection. What we need to do then is we need to take something else outside and put a connection here, a metal connection on these sides of this to make all of these pieces of metal become electrically connected together. Now, there's no evidence that this ever happened. And under 702 and under Daubert, this is his hypothesis. And under 702 and Daubert, he's required to put that hypothesis to the test. But the factual foundation for it is that the filters were actually cracked, right? That's correct. And that's the subject of the Rule 36 admissions. Well, that's part of it. Okay. There's nothing, let me put it this way. There's no evidence that the filter cracked in such a manner or that any of the filters cracked in such a manner that would allow these pieces of metal to come in contact with each other. He's never seen a filter that's done this. So what do you think is the cause of the fire? I think the cause of the fire was the self-heating. The what? It was self-heating of the product within the granulator bed itself. The problem is, Your Honor, what they were producing was a corn fiber and a mixture of sucralose, which is like a sugar. And they were having problems operating the machine, which they never told anybody about, including their own expert. And it was our belief that this material self-heated. The problem was is that no one had a representative sample of what was in the machine because what was in the machine is a mixture. I don't know what you mean by self-heated. You mean a spontaneous combustion? Yes, Your Honor, that's correct. That's an understandable statement. Yes. Kind of like, you know, you have a pile of hay and this stuff heats and there's no way for the energy to get out. So, you know, as far as this opinion is concerned, you know, there's no evidence whatsoever that this connection could ever come in contact. And he's never tested it. What he's done is he's created this hypothesis that says, look, I have this hypothesis that says that I can, you know, do this or that it's possible if I manipulate all these things. But he's never put that to the test and he's never tried to falsify that. And because of that. What do you mean by put that to the test? Well, he could have. Cause a fire? No, he could have done some type of failure analysis to see whether or not this ever happened. He could have done some mathematical calculations to see if we put a certain amount of force on the filter element that we could get these three pieces of metal to connect. But he never did any of that. And that's where we think the failure is. And that's where we think the error is that the court. Why did the judge award attorney's fees to Tate? There was a contract that had an indemnity agreement in it that under the indemnity agreement, it would allow for attorney's fees in the event that there was a breach of contract. And the court found that that indemnity agreement should be read basically alone. And there's also, that's paragraph 5.1. There's another rationale for that, but we can talk about that if you want. Well, under paragraph 5.1, the indemnity agreement, and paragraph 24.7, there's a waiver of circumstantial or consequential damages. Special damages was the key phrase. You all drafted it. It looks deliberately ambiguous. You cited a couple of cases on that point that say special damages can include attorney's fees. Special damages is one of the slipperiest phrases in the law. If you want to read it like Hadley versus Baxendale sorts of damages, I would totally get that. But to promise attorney's fees in the indemnification provision, and then have this slippery little ambiguous escape clause that would effectively, you can read that to defeat any effective remedy, which would seem to cause some problems under the UCC. So I think you've got a pretty tough argument on that issue. Your Rule 36 argument, on the other hand, has some legs. And I'd like to hear a little more about how the district judge tried to navigate that problem and why you think that solution was not sufficient. Well, the district court, I don't believe, really navigated the problem. I believe that they just simply applied the wrong law. You know, we have the Rule 36 admissions. We asked him to hold them to those admissions. You know, at trial, they basically then tried to argue their way around the admissions by now talking about the fact that there was a crack in the filter. And the district court simply said, you know, look, we're going to allow it to come in. Now what's kind of telling is if you look at the separate appendix, there's some comments in there from the district judge right in the beginning, I believe pages 7 through 9, where he even sort of says, look, you know, we're going to allow this evidence of the crack filter come in, but unless the expert can actually show that these things can actually come connected to each other, I don't know how a jury is ever going to make a determination that this is, you know, a theory that's viable. And, you know, frankly, you know, my thinking is that, look, at the time he made that ruling, there was no evidence that any of these connections could come together. And he had a request for admission in front of him that said that there was no evidence. But yet he said, let's let it go to the jury and let's let them weigh it. Well, then we get to the trial and there's no evidence that comes in off the stand that indicates that that's the case either. And all of a sudden we ask him on a Rule 50 motion to do something about it. And he doesn't do anything about it. What about the testimony from Mr. Erster, was it? Mr. Ernster, yes. Ernster, sorry. And that testimony should basically have been disregarded because the admission was there and the way the rule works, Rule 36 works, as this court well knows, is that you can't have contradictory evidence that comes in when that issue has already been resolved. If the court had said that issue was resolved, I probably wouldn't even have had to have gone down that road and asked him the question in the first place. But because of the fact that the court- The judge signaled before trial that he was going to allow that, right?  And that's relevant to- I'm sorry. Yes, the plaintiff, that he was going to allow Ernster or that he was going to allow evidence about crack filters, right? That's correct. Because the plaintiff is arguing that your asking Ernster about it amounted to the default or waivers. Correct. Okay. And I would reserve the rest of my time for rebuttal. Thank you. Thank you. Absolutely. Mr. Kiley. Good morning. It pleads the court, I'm Jack Kiley on behalf of the plaintiffs in this case. We do not believe the court abuses discretion in the way it handled the Rule 36 issue. If I may just skip ahead immediately to the issue that was just brought up with Mr. Ernster. You know, this was something that was not testimony that was admitted to the extent that Mr. Salili elicited on cross-examination. The only evidence that was admitted up until that point that we- because we had no evidence that there were crack filters in the granulator at the time of the fire. What we had was this email from September 1st saying at that time when this audit was taken or whenever this audit was taken, there were 16 damage filters within the granulator. So there was no conclusive evidence put on a trial that there were crack filters in the granulator except- No, but you did argue that you had circumstantial evidence, right? Absolutely. So how do you reconcile that with your Rule 36 admissions? Well, because the fire destroyed all the filters. We had no way of knowing if any of them were cracked or not. And that's the thing is we've gone over this again and again and wondered what would we say differently. For one, we denied the requests because they were poorly worded. Well, you denied them, then you admitted them. It looks like- well, it's very confusing. Well, what we were trying to do was make a good-faith response to it because we anticipated that, you know, that was the question they intended to ask. The thing I struggle with- You don't think you were obliged to indicate here's the circumstantial evidence we have? Well, I think we did. I think we did disclose that, particularly in response to Number 9 where we've indicated that- following the fire, additional work needed to be done to the filter housing because filters were poorly fitting, which would suggest that the filter housing and filters remained poorly fitting even at the time of the fire. And we also indicated that the circumstantial evidence in response to 7 or 8, there's only three questions here that this pertains to, and we indicated that these defendant's employees advised other defendant's employees that it was possible some filter elements had stress on the support, and if that was the case, there was a high risk that new filter elements would break again. So we answered these questions in June or July of 2014, or I guess it's June of 2014, and then in August of 2014, we disclosed the email at issue that indicates that the audit showed that there were 16 broken filters in the granulator on September 1st. And that was an issue with both parties' experts throughout the trial. So, you know, they have this additional information that we consider corrective pursuant to Rule 26 nearly two years before the trial. Well, yeah. The problem, at least as I see it, is this reliance on Rule 26 when Rule 36B is what governs here. And in particular, we've got the Rules Committee making it quite clear that unless the party securing an admission, I'm quoting from those notes, can depend on its binding effect, he cannot safely avoid the expense of preparing to prove the very matters on which he has secured the admission, and the purpose of the rule is defeated. Looks like to me, well, tell me why that's not what happened here. Well, I think looking at what the court applied in the David v. Caterpillar case as well as Rule 26, the discovery doesn't need to be supplemented if the corrective information is provided to the party. That is completely wrong for Rule 36 admissions. My reading of Rule 26 specifically mentions rule requests for admission, so that was the basis of our position, and I think that's the same language that was used by the district court. Do you think you can get out from under an admission by just saying we produced some conflicting evidence? Oh, no, Your Honor. So how do you think those work? Well, I think that we provided corrective information, but I need to be very clear on this point. We still don't have conclusive evidence that there were crack filters in the granulator. You weren't asked about conclusive evidence. You were asked any evidence. Okay. I think that we answered that question as best we could considering the damage that was caused by the fire. We simply don't know if there were. We had the information, and this, again, is all information that was widely known to GLAD for a very long time, but I don't know that I could answer that question any differently now because of the fire, and believe me, we've thought about that in great detail. Why isn't the response to nine where you say you admit to deny that here's the circumstantial evidence that filters were cracked, including the email? I don't understand that. Well, we had at this point in time there was discovery was still ongoing. The request for admission was sent before we had even turned over all of our written discovery. The email was from your own records. Right. We hadn't collected it and distributed it until after that point in time. And what did you do about then when you discovered that email, what did you do about modifying your Rule 36 admission? We admittedly did nothing to modify it at that point. And that's what 36B is for, right? And, again, I don't dispute that. My problem with suggesting the court abuses discretion here is that we still don't know because of the fire if any of those filters were damaged or not. So that's really the problem. Our admission was such that it was because we didn't have the evidence available, and so that we had to maintain that position. I wouldn't change that answer necessarily now based on the fact that we still don't have conclusive evidence. So that's where I keep coming back to. And you're going back to conclusive direct evidence, and that wasn't the way what the admission asked for. It asked for any evidence, and then you say, no, we don't have any, and then you argue in closing we've got all this circumstantial evidence, and the judge lets you get away with it. The question as far as number seven, it was admitted that we hadn't. I was looking at nine, but okay. I'm sorry, nine. Yes, we had not. Our answer, as you acknowledged, was to point out it was not discovered direct evidence that one or more of the granulator filters was cracked or chipped at the time the fire started. Again, until Mike Ernst testified to that on Glatt's cross-examination, that answer wouldn't have been changed. That was the first evidence we had that that fact existed. So, again, I don't know that we would have changed that answer at any point in time until Ernst actually testified at trial. So what were you fighting about this before trial? So if you look where it's cited before the trial, it's with respect to number seven. Number nine really wasn't brought up as much. They cited number seven in the motion in Lemony, seeking to bar any additional defects of other problems with the granulator because there were other problems with the granulator. And so the issue as it's being discussed here today, it didn't strike me as that much of an issue leading up to it because the expert were discussing this cracked filter issue on both sides. The defendant's expert had been provided with information that these filters could crack and the metal could come in contact if significant mechanical forces were applied. So this was always an issue, always an issue. And our position always was we just, because the fire completely destroyed all the evidence, we're never going to know this. So I, and again, I think that we would have been in a situation where our answer would have probably been the same just because of the destruction of the fire. But looking back at it now, I mean, certainly this was early on in discovery. We still had a lot of, no depositions had been taken when these requests for admission except maybe one records custodian had been deposed. We had still a lot of written discovery to be exchanged. So these things came on very early and having experienced the trial and everything else. What caused the fire? Our position was there was a static discharge from a filter. There were 65 filters in this particular granulator. And our expert's opinion was that a static discharge in the filters ignited a dust cloud that led to the fire. And as it relates to that, I believe the second point that Gladys raised today in terms of Daubert, indicating that this particular issue was not tested, we don't believe that our expert had to test that particular part of his hypothesis. The connected metal hypothesis referenced in the brief, in the defendant's brief, is that these three pieces of metal, it was never tested to see if those pieces of metal were touching. He did test other things. He did test what would happen if the metal were touching. And we have provided, you know, certainly a lot of information in our brief that relates to the evidence that our expert relied upon in that particular respect, including the acknowledgment by their own expert that was gleaned from an email from a GLAD employee that these metal pieces could come in contact. So, from our perspective, we have a situation where the other party is even acknowledging these metal pieces could come in contact. There would be no reason to then, you know, provide this testing. Have there been other fires in GLAD's equipment? I mean, this type of equipment. To our knowledge, there was a fire in April of 2016 that was a completely different situation. We looked and we were not aware of other fires in GLAD equipment. We didn't have any other fires in this particular machine until April 2016 when there was a fire in a different room. And they concluded that was a leaky seal, so a completely unrelated situation. And what was the basis for your seeking attorney's fees? Pursuant to the indemnity provision of the contract, section 5.1. Right. It was specifically pointed out that if there was a defect, if the damages were caused by a defect and so forth, that we would be entitled to attorney's fees, professional expenses, et cetera. So what do you think special damages means in the notwithstanding clause? I think, well, as Mr. Spilley points out, we got hit for a motion for partial summary judgment on lost profits. In that particular instance, Judge Long applied 24.7 to find that special damages included lost profits. We don't believe that you can construe attorney's fees that were triggered pursuant to the indemnity clause as special or consequential damages because they're specifically set forth in the contract. Not to mention those fees naturally flowed from the breach because we never would have incurred any fees had GLAD. What are special damages? I don't know the phrase. I think in contractual speaking, it would be those that don't necessarily naturally flow from the breach. Why is that special? I don't know why they're termed that way, but I just think of it in terms of kind of lumped in with consequential and special damages. But my general take is the indemnity clause specifically indicates what's recoverable, which would mean that those are specifically contemplated by the parties, that they would naturally flow from this particular loss as they did, which would make them direct damages not subject to 24.7. If I may very quickly, one of the third points that I need to discuss, I suppose part three, is the issue with respect to the suppression system, the claim that our particular damages were speculative. We need to be clear on a point here that the argument Tate and Lyle raised here was not that a different suppression system would have made a difference. It's that no fire suppression system at all was installed above the bed in the granulator. Several times, GAT is pointing us back to this different system, but our argument is that it should have had a system, and that's what our expert testified to, and it simply did not have that sort of equipment above the granulator bed. It did have an explosion suppression system, but not a fire suppression system. And Mr. O'Connor, who is a GAT witness, testified that the two are not to be confused with one another. The explosion suppression system was designed to detect a rise in pressure to avoid the vessel exploding, of course, and this particular system installed took five or six minutes to detect the fire and to apply this retardant to it. It was completely ineffective in doing so as the fire continued to heat up the machine for a number of hours. In fact, four hours later, they had to turn on the building sprinkler systems to cool down the machine. So it's our position that the system that was installed was inadequate and that they gave us a defective design. I thought you told us no fire suppression system was installed. Correct. There was no fire suppression system above the processing area. There was a fire suppression system below the processing area, and our expert, and I think this is an important point, indicated that the point of that system would have been to detect a fire early and put it out before any damages had been caused. So to the extent they're claiming there was no evidence for the jury to find, the damages would have been reduced or eliminated, I think, is simply not consistent with the testimony that we have in this particular case. And we think it was fair for the jury to conclude that a different system that was specifically designed to detect and put out fires would have detected a fire and put it out sooner, far sooner, than we had here that caused a significant amount of damage. How much did you ask the jury to award? We had the amount with American Guarantee, which was the intervener. We asked for $853,000-something, which was the amount of the judgment. And Tate & Lyle had another claim, I think for another $2 million or so for, or maybe $1.5 million for its repair costs as well that went beyond what the American Guarantee had paid. So if we ordered a new trial, that would all be up for grabs again, right? Yes, and also GAT has a counterclaim that they were initially claiming for, you know, I think $976,000 plus interest. On the purchase price? Correct, correct. And so as it relates to that, as is pointed out, we did have the largest part of our claim was knocked out with the partial summary judgment. On the loss and consequential damages? Right, with the lost profits claim. Thank you. Okay, thank you. Thank you. So, Mr. Salili, anything further? Thank you, Judge. Just quickly turning back to Rule 36, I mean, we're playing a game of semantics here. We're doing the same thing on the suppression system as well, too. We'll get to that in a second, but, you know, we keep trying to parse out the fact of this circumstantial evidence, direct evidence. Did GLAD have fire insurance? Yes, Your Honor. Well, does that pay for the $850,000 or what? Technically speaking, it would cover any type of consequential damages that were, it doesn't cover the product itself, so it's GLAD's money that's on the line. And, Judge, you asked before, you know, why is GLAD litigating this? Well, obviously, you know, there's a claim that their product is defective here, and they take that pretty seriously, and they don't believe that it's defective. And from day one, they've been trying to get to the bottom of what's going on here, and they've been basically not given all the information. Tate and Lyle didn't tell us about operating issues that were going on in the day of the fire where they were trying to dial in a new process of a product that they'd never made before. There were huge amounts of material. So money isn't really the issue because the $850,000 is covered by insurance? No, that's not correct, Your Honor. Why? Because it's to the product itself. So they have fire insurance? They do, but it doesn't cover damage to the product itself. It would cover any type of consequential damages to the building itself. But, Judge, getting back to, you know, the Rule 36 issue, and here's why I think Rule 36 is designed to prevent things like this from happening. We have an admission. We rely on that admission for two years. We get to trial, and now we start trying to argue that when we said there was no evidence, what we really meant was there was no direct evidence, there was circumstantial evidence, and now we're going to try to explain that. When we ask the district court to hold them to that admission, the judge says, no, we're going to let it go, applies the wrong law in doing that, and basically now we're in a situation then where a witness comes up and volunteers information, and Tate and Lyle basically says, oh, we're surprised. We never knew he was going to say that, even though the whole time we've been arguing that we think we have circumstantial evidence, even though our requests for admission say something else. And then, lo and behold, we find out that Tate and Lyle told their expert, it's in the record to assume. Rule 36B says a matter admitted under this rule is conclusively established unless the court on motion permits the admission to be withdrawn or amended. So doesn't that give the judge a lot of latitude? It doesn't, Your Honor. Why? I think the judge on a motion can try to amend or withdraw. That was never presented to him, number one. Number two, the standard. It doesn't say that. The standard, Your Honor. It just says the judge can, no, relieve you from the admission. Correct. But the problem here is the judge applied the wrong standard in doing so because he used David v. Caterpillar, which requires a balancing test on prejudice. And here, when you're doing it under Rule 36B, the proper standard to use is just whether it prejudices us. And I think that after relying upon it for two years, it prejudices us. The difference is that you use Rule 26 as to matters of evidence. Correct. Rule 36 applies to conclusive admissions that a party is not allowed to dispute without that judicial permission, right? Correct. Absolutely correct. Thank you very much. Okay. Well, thank you to both counsel. Move to our next.